**Hearing Date: December 6, 2016 at 10:00 a.m. (EST)**
**Objection Deadline: December 1, 2016 at 5:00 p.m. (EST) (extended by agreement)**

GRANT & EISENHOFER, P.A.
485 Lexington Avenue
New York, NY 10017
Tel: 646-722-8523
Facsimile: 646-722-8501
Gordon Z. Novod

FRIEDMAN OSTER & TEJTEL PLLC
420 E. 79th Street, Suite A
New York, NY 10075
Tel: 646-661-5881
David F.E. Tejtel

ANDREWS & SPRINGER LLC
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
Tel: 302-504-4957
Craig J. Springer

*Counsel to Defendant Jason Aldridge*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 16-10992 (SMB) |
| SUNEDISON, INC., *et al.,* | : | Jointly Administered |
| | : | |
| Debtors. | : | |
| OFFICIAL COMMITTEE OF | : | |
| UNSECURED CREDITORS | : | |
| on behalf of the estates of the Debtors, | : | |
| | : | Adversary Proceeding |
| Plaintiff, | : | No. 16-01257 (SMB) |
| | : | |
| v. | : | **RE: ECF 2, 11** |
| | : | |
| JUAN M. RODRIGUEZ BELTRAN, | : | |
| *et al.* | : | |
| | : | |
| Defendants. | : | |

**DEFENDANT JASON ALDRIDGE'S MEMORANDUM IN OPPOSITION TO
(1) MOTION BY OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR
(I) A DECLARATION AND (II) ENFORCEMENT OF AUTOMATIC STAY
AGAINST LITIGATION INVOLVING CERTAIN CURRENT AND FORMER
DIRECTORS AND OFFICERS OF DEBTORS; AND (2) THE DEBTORS'
(A) RESPONSE TO THE CREDITORS' COMMITTEE'S (I) D&O STANDING
MOTION AND (II) D&O LITIGATION STAY MOTION, AND (B) REQUEST
FOR RELIEF PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 362,
BANKRUPTCY RULE 4001, AND LOCAL RULES 4001-1 AND 9019-1 (I) GRANTING
LIMITED RELIEF FROM AUTOMATIC STAY, (II) COMPELLING RELEVANT
PARTIES TO PARTICIPATE IN MEDIATION, AND (III) TEMPORARILY
EXTENDING STAY WITH RESPECT TO DEBTORS' CURRENT AND FORMER
DIRECTORS AND OFFICERS PENDING THE OUTCOME OF MEDIATION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

SUMMARY OF ARGUMENT ......................................................................... 1

OBJECTION AND STATEMENT TO THE DEBTORS' RESPONSE ....................................... 5

BACKGROUND ........................................................................................ 8

    A.    GLBL's Relationship With SUNE ........................................................ 8

    B.    The *Aldridge* Action ................................................................. 8

    C.    The SUNE Bankruptcy ................................................................. 10

    D.    The Insurance Policies Available to D&Os of GLBL ........................................ 11

OBJECTION ............................................................................................ 12

I.    THE MOTION FAILS TO ESTABLISH THAT THE *ALDRIDGE* ACTION
SHOULD BE ENJOINED UNDER SECTION 362 ....................................................... 12

    A.    The Motion Fails To Establish That The Proceeds Of The D&O Policies
Are Property Of The Estate ............................................................. 12

    B.    Even If the Proceeds of the D&O Policies May Be Property of the Estate,
the Relief Sought By the Committee Under Section 362 Is Inappropriate ........... 17

II.    THE MOTION ALSO FAILS TO ESTABLISH THAT THE *ALDRIDGE*
ACTION SHOULD BE STAYED PURSUANT TO SECTION 105 ............................ 19

CONCLUSION ......................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
298 B.R. 49 (S.D.N.Y. 2003) ................................................................. 13

*In re Allied Digital Techs. Corp.*,
306 B.R. 505 (Bankr. D. Del. 2004) .................................................. 16, 17

*In re Caesars Entertainment Operating Co., Inc.*,
533 B.R. 714 (Bankr. N.D. Ill. 2015), *rev'd on other grounds*, 808 F.3d 1186
(7th Cir. 2015) ......................................................................................... 15

*In re CyberMedica, Inc.*,
280 B.R. 12 (Bankr. D.Mass. 2002) ...................................................... 12

*In re First Cent Financial Corp.*,
238 B.R. 9 (Bankr. E.D.N.Y. 1999) .................................................. 13, 14

*In re Focus Capital, Inc.*,
504 B.R. 296 (Bankr. D.N.H. 2014) ...................................................... 17

*In re Granite P'ers, L.P.*,
194 B.R. 318 (Bankr. S.D.N.Y. 1996) ................................................... 14

*Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*,
2006 WL 3755175 (S.D.N.Y. Dec. 20, 2016) .................................... 19, 20

*In re MF Global Holdings Ltd.*,
469 B.R. 177 (Bankr. S.D.N.Y. 2012) ............................................... 15, 17

*Sample v. Morgan*,
935 A.2d 1046 (Del. Ch. 2007) ............................................................. 21

**Statutes**

11 U.S.C. §105 ................................................................................... *passim*

11 U.S.C. §362 ................................................................................... *passim*

11 U.S.C. §510 ........................................................................................ 15

11 U.S.C. §1109 ................................................................................... 7, 8

**Other Authorities**

*Collier on Bankruptcy* ¶ 7024.05 ................................................................................................7

Fed. R. Bankr. P. 4001 ...................................................................................................................1

Fed. R. Bankr. P. 7001 ...................................................................................................................6

Fed. R. Bankr. P. 7005 ...................................................................................................................7

Fed. R. Bankr. P. 7024 ................................................................................................................7, 8

F.R.C.P. 5 .......................................................................................................................................7

F.R.C.P. 24 .....................................................................................................................................7

Local Rule 4001-1 ..........................................................................................................................1

Local Rule 9006-1 ..........................................................................................................................6

Local Rule 9014-2 ..........................................................................................................................5

Local Rule 9019-1 ..........................................................................................................................1

Defendant Jason Aldridge, by and through his undersigned counsel, submits this objection (the "Objection") to the *Motion for (I) a Declaration and (II) Enforcement of Automatic Stay Against Litigation Involving Certain Current and Former Directors and Officers of Debtor*, filed November 2, 2016, Adv. Proc. ECF 2 (the "Motion") by the Official Committee of Unsecured Creditors (the "Committee"); and to the Debtors' (A) purported response (the "Response") to the Committee's (I) D&O Standing Motion and (II) D&O Litigation Stay Motion, and (B) Request for Relief Pursuant to Bankruptcy Code Sections 105, 362, Bankruptcy Rule 4001, and Local Rules 4001-1 and 9019-1 (I) Granting Limited Relief From Automatic Stay, (II) compelling relevant parties to participate in mediation, and (III) temporarily extending stay with respect to Debtors' current and former directors and officers pending the outcome of mediation." ECF 11. In support of his Objection and in reply to the Response, Mr. Aldridge states as follows:

## SUMMARY OF ARGUMENT

1.      In its Motion, the Committee asks this Court to stay thirty lawsuits that have been brought in various state and federal courts across the country against debtor SunEdison, Inc. ("SUNE"), its non-debtor subsidiaries, TerraForm Global, Inc. ("GLBL") and TerraForm Power, Inc. ("TERP"), and certain of their officers and directors for a broad range of alleged misconduct (the "D&O Actions"). Among the actions that the Committee seeks to stay is a stockholder derivative action filed in the Delaware Court of Chancery by Mr. Aldridge **on behalf of GLBL** (the "*Aldridge* Action") **against four directors of GLBL**. The Committee's request is so broad that it does not even acknowledge that the various defendants in the adversary proceeding are pursuing claims against different non-debtors, for different claims, and on behalf of different parties. For example, the *Aldridge* Action asserts claims not against SUNE or any SUNE

directors or officers, but rather against four GLBL directors in their specific capacities as GLBL directors.[1] Further, the claims asserted by Mr. Aldridge could not be brought by the Committee even if the Committee desired to bring them, because SUNE and its creditors were not harmed by the misconduct challenged by Mr. Aldridge. To the contrary, SUNE and its creditors were the **beneficiaries** of the misconduct alleged in the *Aldridge* Action.

2.       The facts matter here and the Committee's high-level gloss and "one size fits all" approach cannot meet its factual and legal burden for the relief it seeks. Thus, the Committee's generic argument, focused on a uniform fact pattern that deviates sharply from the *Aldridge* Action, is unhelpful to the Court and cannot provide the basis for the Court to grant the relief sought by the Committee.

3.       The *Aldridge* Action alleges that the GLBL director-defendants breached fiduciary duties owed to GLBL in approving an unfair related-party transaction between GLBL and SUNE. The *Aldridge* Action does not assert claims against SUNE or against any current director of SUNE.

4.       Similarly, the *Aldridge* Action does not assert the same claims that the Committee seeks to file derivatively on behalf of SUNE. *See* ECF 1550 (Committee's Derivative Standing Motion (the "UCC Standing Motion")). In the UCC Standing Motion, filed contemporaneously with this adversary proceeding and Motion, the Committee requests Court authorization to file a derivative complaint (the "UCC Derivative Complaint") against certain current and former officers and directors of SUNE (the "UCC Derivative Defendants"). The UCC Derivative

---

[1]      As noted *infra* at note 22, although one GLBL director – Blackmore – was also a SUNE director, the *Aldridge* Action asserts claims against him solely in his capacity as a director of GLBL.

Complaint, if filed and prosecuted, will assert that the UCC Derivative Defendants breached their fiduciary duties owed to SUNE.

5.      The Committee contends that continued prosecution of the D&O Actions by the D&O Adversary Defendants risks depleting directors and officers insurance policies for which SUNE is a named insured (the "D&O Policies"). The D&O Policies comprise a 16-layer tower of insurance providing total coverage of approximately $150 million – as compared to SUNE's roughly *$8 billion* liabilities – for the benefit of SUNE, its subsidiaries, and their directors and officers.[2] The Committee also contends that the D&O Policies and the proceeds thereof are property of the estate under section 362, and should be available for the Committee to recover against if it is successful in a future potential prosecution of the UCC Derivative Complaint. The Committee also contends that the D&O Policies are subject to further depletion from the D&O Actions to the extent that directors and officers seek the payment of defense costs, settlements, or judgments from the D&O Policies. In addition to its section 362 argument, the Committee also requests that the Court enjoin the D&O Adversary Defendants under section 105.

6.      The Committee's Motion lacks merit for a number of reasons, but particularly so with regard to staying or enjoining the continued prosecution of the *Aldridge* Action. As an initial matter, the Committee fails to set forth any competent evidence to support the assertions that it makes in its Motion.[3] For example, the Motion presents no evidence of the amount of the D&O Policies that remains available for payment, or of requests for coverage or notices of claims with respect to any of the D&O Actions or the UCC Derivative Complaint. The

---

[2]   GLBL has an additional five layers of insurance coverage – the GLBL Side A Policies (defined herein) or "TerraForm Global – Side A Program (Layers 16-20)," that are available *only* to GLBL's directors and officers, and which become available after the shared insurance tower is exhausted.  These additional layers (*i.e.*, layers 16-20) are not available to SUNE or its directors and officers in their capacity as such.

[3]   The Committee fails to comply with the Court's Case Management Order (ECF 360 ¶ 7).

Committee's failure to support its assertions with competent evidence is particularly ironic considering that the Motion itself states: "Courts analyze the terms of the policies and consider the facts and circumstances of each case when deciding whether the Debtors have a property interest in the policies." (Motion ¶ 36).

7.      To the extent the Court accepts (and it should not) the assertions in the Motion as true without any evidence to support them, the Motion still fails to establish that a stay of the *Aldridge* Action is appropriate either under Section 362 or Section 105.

8.      The Motion fails to explain why the *Aldridge* Action should be stayed. Indeed, aside from miscategorizing the *Aldridge* Action as a "securities fraud" action, the Motion makes no specific reference to the *Aldridge* Action whatsoever.[4] (Motion ¶ 16). While the defendants in the *Aldridge* Action may have a right to seek payment of their defense costs from the D&O Policies, they could still pursue indemnification and advancement for their defense costs directly from non-debtor GLBL in the event that a stay prevents them from seeking payment from the D&O Policies. The Committee does not argue to the contrary. Whether the *Aldridge* Action defendants will face a monetary judgment to GLBL is completely hypothetical and speculative at this point, but regardless, a stay directed to Mr. Aldridge would be imposed on the wrong party because he cannot assert a claim under the D&O Policies.

9.      But even if the *Aldridge* Action defendants claimed against the D&O Policies to cover their defense costs, a settlement or a judgment, it would be inappropriate for the Court to re-order the priority of payments under the D&O Policies in the fashion sought by the

---

[4]    Similarly, the complaint filed by the Committee on November 2, 2016 in connection with the adversary proceeding (the "D&O Adversary Complaint") falsely states that the *Aldridge* Action was among the several actions that were consolidated into a Multidistrict Litigation proceeding ("MDL") before Judge P. Kevin Castel in the U.S. District Court for the Southern District of New York. D&O Adversary Complaint ¶ 1, n. 2. The *Aldridge* Action was filed and remains pending in the Delaware Court of Chancery.

Committee. The D&O Policies provide coverage for both debtors and non-debtors, and put SUNE at the bottom of the order of priority. A stay here would give SUNE (or the Committee standing in its shoes) rights under the D&O Policies that it did not have outside of bankruptcy.

10.     Finally, a stay of the *Aldridge* Action would be inappropriate because there is a separate $50 million tower of insurance that provides Side A coverage exclusively to directors and officers of GLBL (the "GLBL Side A Policies"). The estate has no interest whatsoever in the GLBL Side A Policies, nor does – or can – the Committee argue otherwise. Thus, the *Aldridge* Action can proceed and the defendants in that action can claim against those policies without any effect on the estate.

11.     For all of these reasons and those set forth herein, the Motion should be denied.[5]

### OBJECTION AND STATEMENT TO THE DEBTORS' RESPONSE

12.     On November 23, 2016, the Debtors filed their Response, purporting to resolve the Motion. Mr. Aldridge is generally amenable to mediation, but not on the conditions set forth in the Response. Rather, it would be on satisfactory terms to be negotiated by the parties to the adversary proceeding (including Mr. Aldridge), and not on terms imposed by the Debtors and the Committee by declaration of a settlement.

13.     Similar to the Motion, the Response is a one-size-fits-all proposal that requires individual consideration and resolution in order to be workable. Moreover, the Response still

---

[5]   Mr. Aldridge believes that discovery of the Committee is necessary concerning the Motion and the Complaint, and hereby requests that the Court establish a discovery schedule in advance of an evidentiary hearing on the Motion.  Pursuant to the Court's Chambers Rules, as well as paragraph 7 of the Court's case management order (ECF 360), as well as Local Rule 9014-2, the December 6, 2016 hearing on the Motion cannot be an evidentiary hearing at which witnesses may testify.

seeks to impose a stay upon defendants, such as Mr. Aldridge.[6] For example, the Response states "(i) this Court would enter an order holding the D&O Litigation Stay Motion and further proceedings on the Proposed Claims in abeyance while mediation is pending; [and] (ii) this Court and the District Court would enter orders (the "Mediation/Stay Orders") staying the D&O Actions," Response ¶ 2. Yet for all the reasons set forth below, even if a non-consensual stay is appropriate for certain Defendants in the Adversary Proceeding – and Mr. Aldridge submits that it is not – the particular circumstances of the *Aldridge* Action make a non-consensual stay of that litigation improper.

14.    Substantively, the Debtors make their case for why the Automatic Stay should be lifted for the purpose of mediation. Yet, there has been no determination that the automatic stay even applies here, and the inclusion of text in paragraph 6 of the proposed order submitted by the Debtors improperly pre-judges the issue.

15.    Additionally, the Debtors describe certain procedural steps that would purport to "facilitate more effective mediation, such as the designation of lead plaintiffs and the filing of consolidated amended complaints in certain of the actions." Response ¶2 n.7. Yet, the *Aldridge* Action was not consolidated before Judge P. Kevin Castel in the U.S. District Court for the Southern District of New York (nor anywhere else), and no such lead plaintiff designation or consolidated amended complaints are appropriate or permitted.

---

[6]    Although styled as a "Response," Debtors' Response is an independent request for relief in that it seeks relief based on different issues, facts, and arguments than as set forth in the Committee's Motion. Yet the Debtors did not file a separate notice of hearing on their quasi motion, did not comply with the requirements of Local Rule 9006-1, requiring service at least fourteen (14) days prior to the return date, did not comply with the Case Management Procedures ¶19 (ECF 360) by failing to serve the quasi motion at least twenty-one (21) days before the applicable hearing, and failed to comply with Bankruptcy Rule 7001 by not filing a request for injunctive relief by adversary proceeding.    Rather, the Debtors simply seek to piggyback onto the relief sought by the Committee in this Adversary Proceeding.

16.     Debtors fail to disclose whether any Defendants in the Adversary Proceeding have agreed to resolve the Motion as set forth in the Response. The Response also includes a proposed order that purports to include in the mediation the "D&O Defendants," but fails to identify or define the "D&O Defendants," and does not state whether such defendants have consented to mediation and whether all the insurers on the "Insurance Policies" have agreed to participate in the mediation. Nor does the Debtors' response identify the TerraForm Global – Side A Program (Layers 16-20) as "Insurance Policies" under the proposed order.

17.     The Debtors' Response refers to mediation of "the Proposed Claims and the D&O Actions, …" (*see, e.g.*, Response ¶ 13), and indicates that the mediation will "…*focus on resolving the Proposed Claims and the D&O Actions without further litigation.*" Response ¶ 13 (emphasis added). Yet, the claims in the *Aldridge* Action fall outside the definition of "Proposed Claims," and there is no incentive for Mr. Aldridge to participate in a mediation focused on claims other than those asserted by him.

18.     Finally, the Debtors' Response makes substantive arguments that request the Court to impose relief under Section 105. Whereas the Committee addressed this issue within a throw-away, two paragraph argument (*see infra* at II), the Debtors devote five pages to seeking this relief. Because the Debtors have not moved to intervene in this action under Bankruptcy Rule 7024,[7] their Response is procedurally improper and their legal argument should be

---

[7]   Bankruptcy Rule 7024 governs intervention in an "adversary proceeding," and expressly incorporates Rule 24 of the Federal Rules of Civil Procedure. Rule 7024(c) requires that the party seeking intervention must serve a motion in accordance with Civil Rule 5 (which applies to an adversary proceeding pursuant to Fed. R. Bankr. P. 7005), and "the motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Bankr. P. 7024(c). Even a party that has a right to intervene pursuant to a statute of the United States must do so upon motion. *Collier on Bankruptcy*, ¶ 7024.05. Thus, the Debtors are not immune from this requirement, even if

disregarded. Even if the Debtors did intervene, the relief sought in the Complaint and the Motion differs dramatically from the relief now sought by the Debtors, and the Debtors would be required to file an amended complaint and consolidated motion on behalf of the Adversary Proceeding Plaintiffs. To the extent that the Debtors subsequently move to intervene under Bankruptcy Rule 7024 and 11 U.S.C. §1109(b), Mr. Aldridge reserves the right to address the legal merits of their arguments at that time, as well as to take discovery of the Debtors concerning the Response, the Committee's Motion, and the Adversary Proceeding.

## BACKGROUND

### A.    GLBL's Relationship With SUNE

19.    GLBL is a publicly traded Delaware corporation with its principal place of business in Bethesda, Maryland. GLBL's capital structure consists of Class A common stock and Class B common stock. Each share of Class B common stock is entitled to 100 votes, while each share of Class A common stock is entitled to one vote. SUNE owns 2% of GLBL's Class A common stock and 100% of GLBL's Class B common stock. As a result, SUNE controls 98% of GLBL's voting power.

### B.    The *Aldridge* Action

20.    On April 12, 2016, Mr. Aldridge filed a stockholder derivative complaint (the "*Aldridge* Complaint") in the Delaware Court of Chancery[8] against Peter Blackmore, Christopher Compton ("Compton"), Hanif Dahya ("Dahya"), and Jack Jenkins-Stark ("Jenkins-Stark"), directors of GLBL. The *Aldridge* Complaint alleges that these directors breached their fiduciary duties owed to GLBL by knowingly and in bad faith approving a purchase agreement

---

11 U.S.C. §1109(b) is interpreted to give the Debtors a right to intervene in the adversary proceeding. The Debtors must still move to intervene under Bankruptcy Rule 7024(a).

[8]   A copy of the *Aldridge* Complaint [publicly available, redacted version] is attached as Exhibit 1 to the Declaration of Gordon Z. Novod ("Novod Decl."), filed herewith.

with SUNE for assets of highly questionable value in order to provide a $231 million lifeline to SUNE, which was on the verge of insolvency.

21.     Because SUNE controlled GLBL, a conflicts committee of purportedly independent GLBL directors considered the related-party transaction – a purchase of yet-to-be-completed solar assets (the "India Projects") for $231 million (the "India Transaction").[9] The *Aldridge* Complaint alleges that the original conflicts committee (the "Old Conflicts Committee") refused to act quickly enough on the India Projects to satisfy cash-starved SUNE. Thus, SUNE appointed three additional directors to the GLBL board (Blackmore, Compton, and Jenkins-Stark), and replaced the Old Conflicts Committee members with these three new directors (the "New Conflicts Committee").[10] In response, three members of the Board, including one of the members of the Old Conflicts Committee, immediately resigned from the GLBL Board.[11] The New Conflicts Committee agreed to SUNE's terms for the India Transaction just **minutes** after being appointed. The transaction called for an immediate cash payment of $150 million, and a second payment of $81 million three days after the signing of the purchase agreement.[12] The full GLBL board subsequently approved the conflicted transaction.[13]

22.     The *Aldridge* Complaint alleged that the members of the New Conflicts Committee, along with Dahya (who approved the transaction as a GLBL director even though as a member of the Old Conflicts Committee he did not support GLBL's extension of a $231

---

[9]   Novod Decl., Ex. 1 ¶¶30, 40.

[10]  Novod Decl., Ex. 1 ¶¶40-46.

[11]  Novod Decl., Ex. 1 ¶50.

[12]  Novod Decl., Ex. 1 ¶56.

[13]  Novod Decl., Ex. 1 ¶74.

million lifeline to financially-distressed SUNE), breached the fiduciary duties they owed to GLBL and its stockholders in approving the India Transaction.

### C.    THE SUNE BANKRUPTCY

23.    On April 21, 2016, SUNE's liquidity crisis caught up with it, and SUNE filed a voluntary petition for relief under title 11 of the United States Code. ECF 1. At the time it filed its petition, SUNE had liabilities of more than $8.7 billion. ECF 4, p. 16 (Declaration of Patrick M. Cook in support of Chapter 11 Petitions and First Day Pleadings).

24.    On April 21, 2016, the Debtors sought modification of the automatic stay, to the extent applicable, to allow for reimbursement of defense costs under the D&O Policies. ECF 32, 33. On May 20, 2016, this Court entered orders that allowed reimbursement from the D&O Policies of defense costs of (i) $8 million for the directors and officers of SUNE and (ii) $12 million for the directors and officers of TERP and GLBL combined. ECF 367; ECF 368; Motion ¶ 14. Those orders, entered after the Committee's formation, provided that the amounts could be increased by written agreement among the Debtors, the Committee, the Tranche B Lenders and Steering Committee, and the DIP Agent. *Id.* The Committee did not object to those motions, nor has it sought to vacate or modify those orders.

25.    On November 4, 2016, the Committee filed the UCC Standing Motion, seeking permission to file the UCC Derivative Complaint against the UCC Derivative Defendants for breaches of fiduciary duty owed to SUNE for, among other things, (i) causing SUNE to make false and misleading public statements regarding SUNE's true financial condition; (ii) engaging in stock sales while knowing, but failing to disclose, the true financial condition of SUNE, GLBL, and TERP; and (iii) causing SUNE, GLBL, and TERP to engage in transactions designed to mask the deteriorating financial condition of SUNE. UCC Derivative Complaint ¶¶ 5-8. None

of the claims set forth in the UCC Derivative Complaint overlap with any of the claims set forth in the *Aldridge* Actions.

26.    On November 2, 2016, the Committee filed the D&O Adversary Complaint, along with the Motion. The D&O Adversary Complaint seeks to enforce the automatic stay under section 362 (or in the alternative section 105) with respect to the thirty D&O Actions, which were brought, in varying iterations, against current and former directors of SUNE, GLBL, and TERP. The D&O Adversary Complaint alleges that the D&O Policies, which provide for certain amounts of shared coverage among officers and directors of the Debtors, GLBL, and TERP, risk depletion if the Court does not grant the relief sought by the Committee. D&O Adversary Complaint ¶ 1. The D&O Adversary Complaint further alleges: "The [] Committee, in a separate adversary proceeding, intends to assert many of these same claims – including claims for breaches of fiduciary duty and other violations of law – against many, if not all, of the same current and former directors and officers." D&O Adversary Complaint ¶ 3.

### D.    THE INSURANCE POLICIES AVAILABLE TO D&OS OF GLBL

27.    According to the Motion, the D&O Policies comprise 16 policies with an aggregate of $150 million in coverage. Motion ¶¶ 25- 27. The policies provide Side A, Side B, Side C and Side D coverage. *Id.*

28.    The GLBL directors and officers are the named insureds on a Side A Directors and Officers Liability Policy with Difference in Conditions issued by Berkley Professional Liability (Policy No. 18017055). The GLBL Side A Policy provides $10 million in coverage and follows the sixteen D&O Policies. Four other policies are excess to the GLBL Side A Policy, and each provides $10 million in coverage in the following order:

- National Liability & Fire Insurance Co. (Policy No.43-EPC-301710-01);
- Aspen American Insurance Co. (Policy No. MC003V515);

- Freedom Specialty Insurance Company (Policy No. XMF1501822);

- Continental Casualty Company (Policy No. 596596127).[14]

29.     Section V.C of the GLBL Side A Policy provides:

C.  The Insured Persons and the Company understand and agree that all coverage
under this Policy shall be specifically excess over, and shall not contribute with:

> 1.     all indemnification and advancement  to which an Insured Person
> may be entitled from any source, including but not limited to the
> Company or any Outside Entity, and

> 2.     any Insurance Program maintained by the Company or any Outside
> Entity, whether such other insurance is stated to be primary,
> contributing, excess, or otherwise.

Provided, however, if Loss is not paid by such other insurance or as
indemnification or advancement, this Policy shall respond on behalf of the
Insured Persons as if it were primary, subject to all of its terms, conditions and
limitations and without prejudice to the Insurer's excess position.

30.     As Side A policies, the GLBL Side A Policies provide coverage only for officers

and directors of GLBL, defining "Insured Person" as past, present, and future officers and

directors of GLBL, their spouses, and their estates, heirs, legal representatives, or assigns in the

event of death, incapacity or bankruptcy.

## OBJECTION

**I.     THE MOTION FAILS TO ESTABLISH THAT THE *ALDRIDGE* ACTION
SHOULD BE ENJOINED UNDER SECTION 362**

> **A.     THE MOTION FAILS TO ESTABLISH THAT THE PROCEEDS OF THE D&O
> POLICIES ARE PROPERTY OF THE ESTATE**

31.     Whether the proceeds of the D&O Policies are property of the estate in this

situation is a threshold question that requires an examination of the applicable facts. *See In re*

*CyberMedica, Inc.*, 280 B.R. 12, 16 (Bankr. D. Mass. 2002) ("Whether the proceeds of a D&O

---

[14]  Collectively, these four policies, along with the Berkley policy, are referred to as the "GLBL
Side A Policies."

liability insurance policy is property of the estate must be analyzed in light of the facts of each

case."). Where, as here, the debtor estate's entitlement to the proceeds of an insurance policy is

hypothetical and speculative, the proceeds of a policy will not be found to be property of the

estate. For example, this Court, in considering whether proceeds of a policy should be considered

property of the estate, stated:

> Although the D & O policies reimburses each estate to the extent that the estate
> advances funds because of the indemnification obligations in the charter or by-
> laws, it has not been suggested that any of the Debtors has made any payments for
> which it would be entitled to indemnification coverage, or that any such payments
> are now contemplated. Furthermore, none of the Debtors have made or committed
> themselves to payments using their entity coverage. Claiming the debtors now
> have a property interest in those proceeds makes no sense at this juncture. Such
> argument would be akin to a car owner with collision coverage claiming he has
> the right to proceeds from his policy simply because there is a prospective
> possibility that his car will collide with another tomorrow, or a living person
> having a death benefit policy, and claiming his beneficiaries have a property
> interest in the proceeds even though he remains alive. No cognizable equitable
> and legal interest in the proceeds from the D & O policies has arisen here.
> Without legal and equitable interest in the proceeds, [the debtor's] estate cannot
> be ascribed to hold a property interest in those proceeds.

*In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 53–54 (S.D.N.Y. 2003) (internal citations and

quotations omitted). Judge Feller in *In re First Cent Financial Corp.* acknowledged that "D & O

policies are obtained for the protection of individual directors and officers," even when there is

indemnification coverage, which "does not change this fundamental purpose." *In re First Cent

Fin. Corp.*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999). As Judge Feller further explained,

> There is an important distinction between the individual liability and the
> reimbursement portions of a D & O policy. The liability portion of the policy
> provides coverage directly to officers and directors, insuring the individuals from
> personal loss for claims that are not indemnified by the corporation. Unlike an
> ordinary liability insurance policy, in which a corporate purchaser obtains primary
> protection from lawsuits, a corporation does not enjoy direct coverage under a D
> & O policy. It is insured indirectly for its indemnification obligations. In essence
> and at its core, a D & O policy remains a safeguard of officer and director
> interests and not a vehicle for corporate protection.

*Id.*

13

32.    Similarly, as the Court pointed out in finding that the automatic stay did not apply

to several claims in *In re Granite Partners, L.P.*, 194 B.R. 318, 337-38 (Bankr. S.D.N.Y. 1996):

> [T]he mere threat to the [D&O] policy does not implicate the automatic stay, and
> [ ] the Court should not extend the automatic stay if that is the only "injury" that
> the debtor can show. In this regard, the debtor's insurance policy is property of
> the estate as is its contractual right to indemnification coverage under the policy.
> The directors' and officers' contractual right to liability coverage, however, is not.
> We are not convinced that an action by a third party to recover a judgment against
> another third party, whose liability may be covered under an insurance policy that
> also grants the debtor separate rights, implicates the automatic stay.

33.    Here, as the Committee concedes in the Motion, the D&O Policies provide for

Sides A/B/C/D coverage. Motion ¶25. Side A coverage covers the directors and officers for

defense costs or the amount of any monetary liability for a judgment or settlement to the extent

not reimbursed by the director's or officer's company. Side B coverage provides coverage to the

company to the extent it is responsible for reimbursing an officer or director for amounts spent

defending an action or for a monetary judgment or settlement. Side C coverage provides

coverage to the company for amounts spent defending certain types of claims brought directly

against the company. *Id.* n.8.[15]

34.    The D&O Policies provide coverage until the proceeds of the policies are

exhausted. [ACE Policy § VII.B] Moreover, the D&O Policies provide a clear priority of

payment. For example section XXI provides: "The insurance provided by this Policy is intended

as a matter of priority to protect and benefit the Insured Persons such that, in the event of

bankruptcy of the Company, the Insurer shall first pay Loss covered under Section I, Insuring

Agreement A, Directors' and Officers' Liability, prior to paying Loss under any other Insuring

---

[15]    The D&O Policies also provide Side D coverage, which covers certain claims against, *inter
alia*, officers or directors of the company who are serving in specific roles of a non-profit
organization or other outside entity identified in the policy at the direction of the company.
The Motion does not discuss Side D coverage, and it is not relevant to the issues here.

Agreement. Similarly, the policy provides that in the event that there is an insufficient amount to pay remaining claims that have been submitted to the insurers, the D&O Policies establish a priority of payment among Side A/B/C coverage with Side A coverage being paid first, Side B coverage being paid second, and Side C coverage being paid third. Despite Side C coverage's being third in the order of priority, the Committee states: "Here, SUNE's Side C coverage is triggered because securities fraud claims have already been asserted against it." Motion ¶ 37.[16]

35.     By seeking to upset this first-billed, first-paid priority, as well as the Side A/B/C priority, the Committee is seeking to establish a priority of payment under the D&O Policies that SUNE – into whose shoes the Committee would step to prosecute the UCC Derivative Action – did not possess prior to filing the Petition. As the Bankruptcy Court for the Northern District of Illinois recently held:

> The debtors' rights under the [relevant] policy are estate property, true enough, but that does not mean they trump [non-debtor's] rights, making the policy proceeds untouchable. To find otherwise, allowing the debtors to hold up payments for [non-debtor's] losses in favor of the debtors' own, would give the debtors rights under the policy they did not have before these cases were filed. It is a truism that the Code does not grant debtors rights greater than they had outside of bankruptcy. Given [non-debtor's] equal and independent right to the policy proceeds, those proceeds are not property of the debtors' estates.

In re Caesars Entertm't Operating Co., Inc., 533 B.R. 714, 735 (Bankr. N.D. Ill. 2015), rev'd on other grounds, 808 F.3d 1186 (7th Cir. 2015) (internal citations omitted); see also In re MF Global Holdings Ltd., 469 B.R. 177, 195-96 (Bankr. S.D.N.Y. 2012) ("[I]n bankruptcy,

---

[16] The Committee's suggestion that the Debtors' estates could collect from the Side C coverage of the D&O Policies is incorrect. As Municipal Employees' Retirement System of Michigan points out in its objection, any securities claims against SUNE are subordinated pursuant to Section 510(b) of the Bankruptcy Code, and given this Court's finding that SUNE is insolvent, such subordinated claims will receive no payment. [ECF No. 12 ¶¶30-38, which Mr. Aldridge incorporates by reference]. Similarly, any claim for indemnification from SUNE by current or former SUNE officers or directors with respect to securities cases will be subordinated and receive no payment from the estates. Id. Thus, the Committee's argument that the automatic stay is necessary to preserve D&O Policy proceeds to prevent diminution of other assets of the estate fails.

insurance proceeds must be used to address losses that fall within the scope of an insurance policy. The filing of a bankruptcy petition does not alter the scope or terms of a debtor's insurance policy and preserves such proceeds for those covered by the insurance policy.").[17]

36.    The Motion should also be denied because it fails to provide any evidence to establish a number of facts that are critical for determining whether the relief the Committee seeks is appropriate under either section 362 or section 105.[18] For example, the Committee has presented no evidence, *inter alia*, of: (i) the amount of the insurance proceeds that remain available under the D&O Policies; (ii) whether any notices of claim or requests for coverage have been asserted against the D&O Policies with respect to the D&O Actions or the UCC Derivative Action; (iii) the dollar amount of any such notices of claim or requests for coverage; or (iv) the likely amount of the cost of defense or monetary payment for settlement or judgment of any of the D&O Actions or the UCC Derivative Action. In short, the Motion fails to provide any evidentiary support for its claim regarding the potential impact on the debtors' estates.

37.    The Motion also fails to acknowledge that this Court has already permitted proceeds of the D&O Policies to be used to pay the defense costs of TERP's and GLBL's directors and officers of up to $12 million. ECF 32, Ex. B, 367. That Order makes clear that the Court did not determine "that the proceeds of the D&O Policies are property of the Debtors' estates, and the rights of all parties in interest to assert that the proceeds of the D&O Policies are, or are not, property of the Debtors' estates…" ECF 367 ¶6. The Motion appears to be a thinly

---

[17] This is particularly true to the extent that the Committee seeks to preserve the remaining balance of the D&O Policies for recovery as a plaintiff in the UCC Derivative Action. *See In re Allied Digital Techs. Corp.,* 306 B.R. 505, 512 (Bankr. D. Del. 2004) ("[W]hen a suit is brought on behalf of the debtor, the courts generally hold that the debtor is merely an indirect insured and the proceeds are not property of the estate.").

[18] The Case Management Order governing this bankruptcy proceeding requires that a "Court Filing requesting or requiring the Court to make a factual finding must be supported by competent evidence (e.g., declarations, affidavits, and exhibits)." [ECF No. 360 ¶ 7]

veiled attempt to sidestep that order, thus removing the predicate for the payment of defense costs in the first place.[19]

### B. EVEN IF THE PROCEEDS OF THE D&O POLICIES MAY BE PROPERTY OF THE ESTATE, THE RELIEF SOUGHT BY THE COMMITTEE UNDER SECTION 362 IS INAPPROPRIATE

38.     The Committee is pursuing the wrong litigants if its ultimate goal is to prevent the insured directors and officers from recovering defense costs and potential claims under the D&O Policies. The appropriate mechanism would have been for the Committee to sue the directors and officers themselves to prevent them from making claims and recovering under the D&O Policies. If this Court granted that relief, the potential effect on the D&O Actions could then be determined by the state and federal courts in which those actions are being adjudicated.[20]

39.     This is particularly true with respect to actions such as the *Aldridge* Action, where the only claims being pursued are not against SUNE or its directors and officers, but rather against GLBL's directors. The GLBL Side A Policies (i.e., TerraForm Global – Side A Program (Layers 16-20)) would "drop-down" to provide coverage to those officers and directors to the extent that they are not provided indemnification from GLBL or coverage from the D&O Policies. The stay/injunction of the *Aldridge* Action sought by the Committee would prevent the *Aldridge* Action defendants from utilizing the dedicated TerraForm Global – Side A Program (Layers 16-20), and would negate this Court's prior acknowledgement that it would not interfere

---

[19]  To the extent that the Committee wishes to re-litigate that order, a Rule 60 motion would be the appropriate vehicle to do so, not this Motion.

[20]  The cases cited by the Committee demonstrate the unusual nature of seeking to preserve the value of the D&O Policies by suing plaintiffs in the D&O Actions and seeking enjoinment of those actions.  *See*, *e.g.*, *In re MF Global*, 469 B.R. at 181 (debtors' insurers seek determination that proceeds of policy are not property of the estate); *In re Focus Capital, Inc.*, 504 B.R. 296 (Bankr. D.N.H. 2014) (motion brought by judgment-creditors seeking to recover insurance proceeds from policy); *In re Allied Digital Techs. Corp.*, 306 B.R. 505 (Bankr, D. Del. 2004) (motion by directors and officers to recover proceeds under insurance policy).

with the rights under the TerraForm Global – Side A Program. ECF 367 ¶3 ("Notwithstanding

anything to the contrary [t]herein, nothing in the [m]otion or th[at] [o]rder, including the Cap

Amount under paragraph 2 of th[at] [o]rder, shall affect the ability of the Insured Persons to

access the full amount of coverage provided under … the 'TerraForm Global – Side A Program

(Layers 16-20),' …").

40.     The Motion does not establish what effect, if any, GLBL's indemnification

obligation would have on SUNE. The Committee omits such discussion quite deliberately, as

GLBL has already filed a proof of claim against SUNE's estates (claim no. 5899) and the

continued prosecution of the D&O Actions against non-debtors would not increase the claims

asserted against SUNE or its estate.[21]

41.     As noted above, the D&O Policies comprise a 16-layer tower of insurance

providing total coverage of approximately $150 million for the benefit of SUNE, its subsidiaries,

and their directors and officers. GLBL has an additional five layers of insurance coverage --

"TerraForm Global – Side A Program (Layers 16- 20)" – that are available only to its D&Os and

to GLBL itself, and which become available after the shared insurance tower is exhausted. These

additional layers (i.e., 16-20) are not available to SUNE or its D&Os in their capacity as such.

42.     The Committee has failed to establish that the proceeds of the D&O Policies

should be considered property of the estate for which a section 362 stay should be enforced. It

has also failed to establish that even if the proceeds of the D&O Policies should not be depleted

---

[21]   GLBL's proof of claim states, in relevant part:  "In addition, current and former directors and
officers of GLBL are defendants to derivative actions asserted by GLBL shareholders, and
GLBL has indemnification obligations to such officers and directors.  GLBL may be in turn
entitled to indemnity or contribution from SunEdison for amounts paid to indemnify such
officers and directors under applicable law and/or certain of the contracts identified in Annex
A."  [Addendum to Proof of Claim Form Filed by TerraForm Global, Inc., on Behalf of Itself
and Its Subsidiaries ¶ 13].

by the D&O Actions, then the appropriate remedy is staying the D&O Actions in their entireties, rather than a remedy more narrowly tailored to the Committee's stated goal of protecting what coverage remains under the D&O Policies.

## II.   THE MOTION ALSO FAILS TO ESTABLISH THAT THE *ALDRIDGE* ACTION SHOULD BE STAYED PURSUANT TO SECTION 105

43.     In a single-page throwaway argument, the Committee asks, in the alternative, that the Court stay the D&O Actions under section 105. Because the Committee has not met its burden for an injunction under section 105, the Court should deny this additional request.

44.     "The determination of whether an injunction should issue calls into play the traditional preliminary injunction standard as modified to fit the bankruptcy context." *Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*, 2006 WL 3755175, at *4 (S.D.N.Y. Dec. 20, 2006). The Court described this standard as follows:

> Although the first requirement is classically that there be a danger of imminent, irreparable harm to the estate, there is a limited exception permitting "issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process." Even under this narrow exception, the threat to the reorganization process must be imminent, substantial and irreparable. As for the second requirement, there must be a reasonable likelihood of a successful reorganization. Third, the court must balance the comparative harm to the debtor, and to [the] debtor's reorganization, against that to the would-be-enjoined party should an injunction be issued. Fourth, the court must consider the public interest which "requires a balancing of the public interest in successful bankruptcy reorganizations with other competing societal interests." In evaluating these factors, the court takes a flexible approach and no one factor is determinative.

45.     These factors weigh in favor of denying the requested relief. With respect to the first factor, the Committee has failed to show that the continued prosecution of the *Aldridge* Action constitutes an "imminent, substantial, and irreparable" "threat to the reorganization process." *Id.* Because the *Aldridge* Action is brought derivatively on behalf of GLBL against directors and officers of GLBL, there is little risk that the attention of SUNE management will be

diverted from the reorganization to, for example, monitoring the *Aldridge* Action or responding to discovery requests served therein.

46.    Regarding the second factor, the Committee does not even address whether there is a reasonable likelihood of a successful reorganization.

47.    With respect to the third factor, the possibility that some percentage of whatever remains of the $150 million in insurance proceeds available under the D&O Policies may not be available to satisfy any judgment or settlement of the UCC Derivative Complaint does not threaten the reorganization. Regardless of the precise amount, the available proceeds under the $150 million D&O Policies are a fraction of SUNE's approximately $8 billion in liabilities. The Committee's argument that "the continued prosecution of the D&O Actions during Debtors' bankruptcy will siphon away the Debtors' interest in the D&O Policies," (Motion ¶45), is unavailing not only due to the magnitude of the Debtors' cases, but also due to the fact that the unsecured creditors' purported entitlement to such proceeds is based on an intra-creditor agreement with SUNE's secured lenders. *See* Motion ¶4 n.4 (citing ECF 523). Thus, there is little harm to the debtor's reorganization if the Motion is denied. By contrast, the harm to Mr. Aldridge and GLBL is substantial if the injunction is granted because a stay would prevent Mr. Aldridge from pursuing claims against non-debtor D&Os that implicate insurance policies other than the D&O Policies.

48.    The UCC Derivative Complaint seeks to assert claims on behalf of SUNE against certain former officers and directors of SUNE for taking actions that harmed SUNE. Recoveries on such claims would benefit SUNE's unsecured creditors. The *Aldridge* Complaint, on the other

hand, seeks to recover for harm caused to GLBL by the actions of certain directors of GLBL.[22] The UCC Derivative Complaint alleges that the SUNE directors' and officers' forcing GLBL to prepay $231 million to SUNE for the India Projects was a sham transaction designed to conceal SUNE's deteriorating financial condition. UCC Derivative Complaint ¶¶101-104. In contrast, the *Aldridge* Action seeks to rectify the harm that the GLBL directors caused GLBL (and GLBL's public shareholders) by knowingly entering into the egregiously unfair India Transaction and providing a $231 million financial lifeline to SUNE. If the *Aldridge* Action is stayed, the delay in prosecuting that action could effectively prevent GLBL from pursuing these causes of action against its directors. Moreover, staying the *Aldridge* Action would be particularly inequitable because that prohibition would be imposed at the behest of the very same creditors who benefited from the $231 million lifeline from GLBL to SUNE.

49.     The fourth factor – regarding the balancing of any threat to reorganization against competing societal interests – also favors denial of a section 105 injunction. There is no threat to the reorganization posed by the continued prosecution of the *Aldridge* Action. By contrast, Delaware has a strong public policy interest in holding fiduciaries of corporations accountable for their wrongdoing. *See*, *e.g.*, *Sample v. Morgan*, 935 A.2d 1046, 1048 (Del. Ch. 2007) ("These sophisticated defendants had to know of the strong interest Delaware has in ensuring that Delaware corporations and their stockholders have access to this court to hold corporate fiduciaries and their advisors accountable for honoring their legal and fiduciary obligations.").

---

[22] Only one of the defendants in the *Aldridge* Action is named in both complaints. Peter Blackmore had served on the SUNE board for nine years before resigning in November 2015 to be appointed by SUNE as a director of the GLBL board and a member of the New Conflicts Committee. The UCC Derivative Complaint seeks to hold Mr. Blackmore accountable as a fiduciary of SUNE for his actions while a director of SUNE, whereas the *Aldridge* Action seeks to hold him accountable in his capacity as a GLBL director for breaches of the fiduciary duties that he owed to GLBL during his tenure on the GLBL board of directors.

50.     Each of the foregoing factors overwhelmingly weighs against the entry of an injunction under section 105.

## CONCLUSION

For the foregoing reasons, Mr. Aldridge requests that the Motion be denied as to him, and that the Court not enjoin the continued prosecution of the *Aldridge* Action under either section 362 or section 105 of the Bankruptcy Code.

Dated: December 1, 2016
      New York, New York

/s/ Gordon Z. Novod
GRANT & EISENHOFER, P.A.
485 Lexington Avenue
New York, NY 10017
Tel: 646-722-8523
Facsimile: 646-722-8501
Gordon Z. Novod

ANDREWS & SPRINGER LLC
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
Tel: 302-504-4957
Craig J. Springer

FRIEDMAN OSTER & TEJTEL PLLC
420 E. 79th Street, Suite A
New York, NY 10075
Tel: 646-661-5881
David F.E. Tejtel

*Counsel to Defendant Jason Aldridge*